**UNITED STATES of America, Appellee,**

v.

**Ernest HARVEY, Jr., Appellant.**

**No. 1264, Docket 75–1053.**

United States Court of Appeals, Second Circuit.

Argued Aug. 13, 1975.

Decided Nov. 20, 1975.

Certiorari Denied March 8, 1976.

See 96 S.Ct. 1432.

**530**

George W. F. Cook, U. S. Atty., D. Vt. (William B. Gray, Asst. U. S. Atty., D. Vt., of counsel), for appellee.

Bennett E. Greene, Burlington, Vt., for appellant.

Before GURFEIN, VAN GRAAFEILAND and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal by Ernest Harvey, Jr., from a judgment of conviction entered in the United States District Court for the District of Vermont after a jury trial before Albert W. Coffrin, *District Judge*. The six-count[1] indictment upon which Harvey was tried charged, in essence, the following offenses:

Count I—

Conspiracy from on or about July 1, 1973, up to and including August 4, 1973, to (1) transport in interstate commerce goods of the value of $5,000 or more, to wit the proceeds of a burglary, knowing the same to have been stolen, in violation of 18 U.S.C. § 2314, (2) to transport dynamite, knowing that such dynamite was stolen, in violation of 18 U.S.C. § 842(h), and (3) to transport and receive dynamite in interstate commerce with knowledge and intent that the dynamite would be used unlawfully to damage and destroy a building and other real and personal property, in violation of 18 U.S.C. § 844(d);

Count II—

Unlawful, willful and knowing transportation and receipt and attempt to transport and receive in interstate commerce dynamite on or about August 3, 1973, with the knowledge and intent that it would be used to damage

---

1. Count V of the indictment was dismissed with the consent of the government at the close of the trial.

and destroy buildings and other real and personal property, in violation of 18 U.S.C. §§ 844(d) and 2.

Count III—

Unlawful, willful and knowing shipment and transportation of dynamite in interstate commerce on or about August 3, 1973, by a person having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 842(i)(1), 844(a) and 2.

Count IV—

Unlawful, willful and knowing receipt, concealment, transportation and disposal of dynamite on or about August 3, 1973, with knowledge and reasonable cause to believe that the dynamite had been stolen, in violation of 18 U.S.C. §§ 842(h) and 2.

Count VI—

Conspiracy with one Gerald L. Dunham, from on or about August 1, 1973, up to and including September 15, 1973, to injure, oppress, threaten and intimidate Byron Nutbrown, III, a citizen of the United States, in the free exercise and enjoyment of a right and privilege secured to him by the Constitution of the United States, and because of his having exercised that right, to wit, the right to give information to the proper authorities concerning the violations alleged in Counts I–V which conspiracy resulted in the death of Byron Nutbrown, III, in violation of 18 U.S.C. § 241.

No motion for severance of the various counts having been made, Harvey's trial on all counts of the indictment began on October 21, 1974.[2] On October 28, 1974, the jury returned a verdict of guilty on all counts and further found that Byron Nutbrown's death resulted from the Count VI conspiracy. The district court sentenced Harvey to imprisonment for a term of 5 years on Count I, terms of 10 years on each of Counts II, III and IV to run concurrently with each other but consecutively to the term imposed on Count I, and a life term on Count VI to run consecutively to the terms imposed on the other counts. Harvey's major contention on this appeal is that the introduction into evidence of certain extrajudicial statements of Bryon Nutbrown, III, the deceased victim of the conspiracy charged in Count VI, was prejudicial error which necessitates the reversal of his conviction. He claims that the statements were inadmissible hearsay and that the statements were the only corroborative evidence of the testimony of the government's chief witness, George Kiblin, an unindicted co-conspirator. He contends that without such corroboration, the jury might well have disbelieved the testimony of such a witness with respect to Harvey's participation in the underlying conspiracy and dynamite crimes alleged in Counts I–IV of the indictment. Because we hold that the statements in question were not hearsay and because we find no merit in Harvey's other contentions, we affirm.

## I. The Facts

The facts upon which Harvey's convictions are based were testified to primarily by George Kiblin. His testimony reveals that sometime prior to August 3, 1973, he and Harvey, who had been friends since 1971, discussed plans to burglarize a lumberyard in Newport, New Hampshire. At the time, Kiblin lived in Newport. Harvey resided in Barre, Vermont, about 100 miles from there. On August 2, 1973, Harvey telephoned Kiblin at his mother's home in Newport, and they agreed to commit the

---

**2.** Gerald L. Dunham had been cited as a co-conspirator and co-defendant in all counts of the indictment. On September 30, 1974, Dunham, however, entered pleas of guilty to Counts I and II and of *nolo contendere* to Count VI. He was ultimately sentenced, after Harvey's trial, to consecutive terms of five years on Count I and ten years on Count II and a term of 45 years on Count VI to run concurrently with the sentences on Counts I and II.

burglary on the following night. The target of the burglary was the lumberyard's safe which allegedly contained more than $10,000. Kiblin described the safe to Harvey and explained that they would need extensive "firepower" to open it. Harvey confirmed that he would arrive the following night and would take care of the needed "firepower." Later the same evening Harvey again telephoned Kiblin, reconfirmed that he would bring enough "firepower" and explained that he would also be bringing with him Gary Dunham, who resided in Williamstown, Vermont, a town adjacent to Barre.

At about 6:00 p.m. on the evening of August 3, 1973, Byron Nutbrown, a 15 year old high school student and long time friend of Harvey, was dropped off by his mother at Harvey's house, ostensibly to go camping with Harvey.[3] He brought with him a sleeping bag, a knife and a walkie-talkie, two-way radio. At 9:30 p.m. Harvey called Kiblin and notified him that he was "in town," that everything was "all set," and that Harvey was prepared to pick up Kiblin immediately. Shortly thereafter, Harvey, Dunham and Nutbrown arrived at Kiblin's house in Harvey's automobile. Kiblin was acquainted with both Dunham and Nutbrown and immediately informed Harvey that he was disturbed by Nutbrown's presence. The group then drove around the area for a while, purchased gasoline, beer and other refreshments and further discussed the problem of Nutbrown's presence. Kiblin finally accepted the boy's presence after Harvey declared that he would accept all responsibility for the boy and, further, warned Nutbrown in the others' presence that if, in the event that they were caught, he talked to the authorities or signed any statement, Harvey would kill him. Nutbrown indicated that he would not talk to authorities.

The ill-fated break-in actually began at about midnight. Harvey gave the instructions. Dunham was to drop the other three at the lumberyard and then drive the car to a nearby gravel pit where he would wait and also monitor police radio broadcasts, keeping in touch with the others by means of the car's two-way radio. Nutbrown was to serve as a look-out, using one of the walkie-talkies to keep in touch. Kiblin, who had the other walkie-talkie, was to accompany Harvey into the lumberyard. Harvey removed the burglary tools from the trunk of his car. Among those tools was a paper bag containing explosives. He gave the bag to Kiblin but kept the detonating caps himself.

As planned, Dunham dropped off the others and left, Nutbrown took up his look-out post, and Harvey and Kiblin attempted to break into the lumberyard. Harvey climbed a ladder and clipped some wires which apparently activated an alarm at the local police station. When the police officers arrived at the scene, Kiblin and Harvey, who were apparently still attempting to gain entry, tried to escape. Kiblin fell, injured himself and was apprehended. The equipment, including the dynamite, was seized at the scene by the police. Harvey was recognized by the police officers but escaped into the night. Nutbrown left the scene and wandered to a nearby house. He related what had happened to the resident who immediately notified the police. Nutbrown was then taken to the police station where he signed a statement implicating the other three in the attempted robbery.[4] Dunham was apprehended at the gravel pit, where he was still waiting in Harvey's automobile.

Harvey was also subsequently arrested and detained at the Sullivan County, New Hampshire jail with Kiblin and Dunham. While in that jail the three

---

3. Harvey had in the past been something of a father to Nutbrown. He had on prior occasions taken Nutbrown and Nutbrown's brother Raymond on camping trips.

4. Nutbrown's mother was notified and came to the Newport police station where she picked up Byron at about 6:00 a.m. on August 4, 1973.

discussed the charges which might ensue from their activities together with the possible sources of evidence against them. At some point during their conversations, Kiblin informed the others that he thought they might be facing federal charges if the government discovered their transportation of dynamite from Vermont for use in the New Hampshire burglary. Harvey expressed concern that Nutbrown knew where the dynamite had come from and that if the authorities had any statement implicating him, it must have come from Nutbrown. Harvey indicated that Nutbrown was a "problem" which they would have to "take care of," especially since Nutbrown knew the source of the dynamite. All three were interested to see whether or not Nutbrown would appear at the scheduled probable cause hearing on the state burglary charges.

Nutbrown did not appear at that hearing. Consequently, the state charges against Harvey and Dunham were dropped and the two were released from custody. Shortly thereafter, Kiblin posted bail and he too was released from custody.

Toward the end of August, Harvey called Kiblin and proposed a meeting in Ascutney, Vermont, only a short distance from Newport, New Hampshire. Harvey and Dunham then picked up Kiblin and they proceeded to a bar in Ascutney. After some conversation, Harvey left for his home in Barre. He advised both Dunham and Kiblin to meet him at Dunham's house in Williamstown, Vermont at 10:30 that evening. When Kiblin and Dunham did not arrive until midnight, Harvey was very upset and told the others that he had had Nutbrown with him at 10:30. According to Harvey, they could have "got rid" of the "problem" if Kiblin and Dunham had arrived on time. At this point Kiblin argued that he did not wish to become involved in or know anything about such a scheme. Harvey, however, made it clear that Kiblin was to stay with Dunham in Vermont until Harvey could get to Nutbrown again. Kiblin was told that his job was to pick up a car when Harvey and Dunham needed it.

Kiblin remained at Dunham's house until September 8, 1973. Late in the afternoon of that day, Dunham received a telephone call. Shortly thereafter, while it was still daylight, Dunham's wife drove Dunham and Kiblin to a secluded spot on a dirt road. After Mrs. Dunham had driven off, Dunham and Kiblin proceeded afoot through the forest to an abandoned house that Dunham had shown to Kiblin sometime earlier. After a short wait, Kiblin saw Harvey drive up behind the house. Nutbrown was with him in the car. After he and Nutbrown got out of the car, Harvey gave Kiblin the keys and directed him to remove several shovels and a piece of plastic from the trunk. Kiblin did so and then drove off. As he was leaving, Kiblin noticed that Harvey and Dunham had "ahold" of Nutbrown and that Harvey's arm was around Nutbrown's throat.

After he had driven around for a time and then visited some friends, Kiblin returned to the abandoned house to pick up Harvey and Dunham between 8:00 p.m. and 9:00 p.m. Harvey took the car keys, placed some items in the car's trunk and then drove the three of them away from the house. While in the car, Harvey announced that "the problem was over" and further directed Dunham to dispose of some clothes.

The next day Nutbrown's mother reported to the police her son's failure to return home. She also testified at the trial that the last person with whom she had seen Nutbrown during the afternoon of September 8, 1973 was Ernest Harvey.

It was not until June 20, 1974 that the facts concerning Nutbrown's disappearance began to surface. On that date, Kiblin testified, under a grant of immunity, before a Federal Grand Jury concerning his participation in both the use of the dynamite in the lumberyard burglary and the disappearance of Byron Nutbrown. Several days later, Nutbrown's body was discovered by state and

federal authorities in a shallow grave about 200 yards behind the abandoned house. The body was unclothed. The medical examiner's autopsy revealed that death was caused by mechanical asphyxia.

At Harvey's trial the government introduced into evidence, over Harvey's objections, the statement which Nutbrown had signed on the night of the burglary. The government also elicited testimony, over Harvey's objections, from two police officers, Laurence Wade and Ronald West, concerning the substance of oral statements made by Nutbrown during interviews conducted shortly after the burglary. Finally, Nutbrown's mother was also allowed to testify, again over Harvey's objections, about other statements which Nutbrown had made to her after the burglary. All of Nutbrown's extra-judicial statements generally implicated Harvey in the lumberyard burglary. Further, Detective West testified that Nutbrown had told him that Harvey had admitted to having blown the door off a safe in the past. Lastly, Nutbrown's mother testified that Nutbrown had told her that, at Harvey's direction, Nutbrown, Mrs. Harvey and Mrs. Dunham had disposed of stolen goods, including dynamite, by throwing them into a river the day after the burglary.

Harvey's objections, both at the trial and on this appeal, to the admission of Nutbrown's statements rest upon the hearsay nature of those statements. He argues that the statements were hearsay as to Counts I–IV and were irrelevant to Count VI. The government, on the other hand, has consistently maintained that the statements were not hearsay since they were offered solely to show Nutbrown's state of mind following the burglary. According to the government, the statements were offered only with respect to Count VI of the indictment, the count charging the conspiracy to violate Nutbrown's civil rights. The district court accepted the statements on that theory and issued a strict limiting instruction to the jury after each admission.[5]

## II. *Discussion*

We begin our analysis by accepting the government's contention that, as to Count VI of the indictment, the proffered statements were not hearsay, but were in fact verbal acts which defined Nutbrown's state of mind prior to his unfortunate demise. See *Anderson v. United States*, 417 U.S. 211, 219–21, 94 S.Ct. 2253, 41 L.Ed.2d 21 (1974); *United States v. DeCarlo*, 458 F.2d 358, 362–65 (3 Cir., 1972) (*en banc*), *cert. denied,* 409 U.S. 843, 93 S.Ct. 107, 34 L.Ed.2d 83. Our acceptance of that characterization of the statements, however, does not end our inquiry. We must seek to determine how Nutbrown's state of mind was relevant to the prosecution of Count VI and further, whether or not these statements were sufficient to prove that state of mind.

The prosecution presented Count VI of the indictment to the jury on the theory that Harvey, Dunham and Kiblin conspired to murder Nutbrown in order to prevent him from revealing his knowledge about the conspirators' use of dynamite during the commission of the New Hampshire burglary. Such use of dynamite, its interstate transportation and the interstate transportation of the

5. The Court instructed the jury with respect to Nutbrown's signed statement as follows:

"Now, Government's Exhibit '5' is a statement of Byron NUTBROWN III which the police officer testified about yesterday. The Court is admitting this, not for establishing the truth of those matters which are set forth on the statement, but solely on the issue of knowledge and awareness of which Byron NUTBROWN may have had as to relevant events involving Mr. HARVEY in connection with Count 6. I want to stress that you can not use this statement for any purpose or in any way with reference to the guilt or innocence of Mr. HARVEY as far as Counts one through five are concerned, and only for the limited purpose in connection with Count 6, that is as I have just explained it to you."

The limiting instructions given after the introduction of the other statements were substantially similar.

fruits of a burglary, i. e., stolen goods worth more than $5,000, are, of course, crimes against the United States, triable in the federal district court.

This Court has held, in *United States v. Pacelli*, 491 F.2d 1108, 1113–15 (2 Cir., 1974), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 that 18 U.S.C. § 241, the statute allegedly violated here, contemplates the right to give information to the authorities about federal crimes or to testify at a federal trial. In order for Nutbrown's state of mind to be relevant to Count VI, that state of mind must bear some relationship to the conspiracy which resulted in Nutbrown's death. Two possibilities of such a relationship readily come to mind.

First, Nutbrown's state of mind, or more accurately, the state of his knowledge or awareness, might establish his status as a potential witness in a federal trial. It might be argued that without a showing of such a status, there could be no right violated, notwithstanding the conspirators' collective intent to intimidate a person they *thought* would be a potential witness. The other possible relevance focuses upon the conspirators' motive and intent rather than the protected right. Since we hold that Nutbrown's state of mind was relevant to the issue of Harvey's intent and motive, and that Nutbrown's extra-judicial statements were admissible to prove that state of mind, we need not decide whether a particular victim's objective right to testify in a particular case must be proved in order to prove a crime under 18 U.S.C. § 241.[6]

Harvey argues that because there was no evidence that he knew that Nutbrown had made the particular statements involved or that he knew the contents of those statements, they were not relevant to prove his motive. We disagree with both his premise and his conclusion.

Kiblin's testimony established that the purpose of the conspiracy to murder Nutbrown was to prevent him from revealing what he knew and might testify to concerning the source, transportation and use of the dynamite, not because of past statements to the authorities inculpating the conspirators. It was the conspirators' fear that Nutbrown would reveal his knowledge about the federal crimes which caused his demise. The extent of that knowledge was critical to the prosecution.

The goal of the conspiracy was to escape conviction on possible federal charges. The greater the probability of conviction became, the greater the motive to try to short-circuit the process which would produce such a conviction. Had Nutbrown possessed no knowledge about the alleged crimes, there would have been no reason to fear his testimony and thus no motive to prevent him from testifying; in short, the more extensive his knowledge inculpatory to the conspirators, the greater the probability of conviction.

Harvey has not argued, nor do we think he can, that he was unaware of the extent of Nutbrown's inculpatory knowledge. There was direct testimony from Mrs. Nutbrown that her son was with Harvey late in the afternoon on the day of the burglary. Furthermore, Kiblin testified that Nutbrown was with Harvey and Dunham when they arrived in Newport and was present during the burglary. Lastly, Kiblin also testified that while in custody at the Sullivan County Jail, Harvey stated that Nutbrown knew the source of the dynamite. The state of mind which the statements

---

6. While there may be some doubt as to whether or not a conspiracy to violate a person's civil right, without a showing that the particular target of the conspiracy objectively possessed that right during the conspiracy, states a crime under 18 U.S.C. § 241, Kiblin's direct testimony in the instant case that Nutbrown was a member of the burglary team, and thus capable of corroborating the testimony alleging federal crimes, establishes beyond doubt that Nutbrown was a potential federal witness and accordingly did have the objective right contemplated by the statute.

tended to prove was the cumulative result of Nutbrown's direct contacts with Harvey. We fail to see how Harvey could not have known the extent of potentially damaging testimony from Nutbrown. We therefore conclude that the extra-judicial statements of Byron Nutbrown were properly admissible to prove the scope of his knowledge, an important factor in showing Harvey's motive.

There can be little doubt that the admission of the statements could have had a prejudicial effect upon Harvey's defense against Counts I–IV. The district court was, however, well aware of that possible prejudice and carefully instructed the jury, upon the admission of each statement and in its final charge, that it was to consider the evidence solely to determine Nutbrown's state of mind with respect to Count VI. Furthermore, although Harvey was aware, before trial, of the existence of Nutbrown's written statement and of the government's intention to introduce that statement in connection with Count VI, he never moved to sever Counts I–IV from Count VI for trial.[7] Under these circumstances it was well within the discretion of the trial court to weigh the probative value of the evidence against its possible unfair prejudice and to allow it. *United States v. Leonard*, 524 F.2d 1076, 1092 (2 Cir., 1975). Where the trial court has exercised its discretion, this Court has held that the trial court's "determination will rarely be disturbed on appeal." *United States v. Ravich*, 421 F.2d 1196, 1203–04 (2 Cir., 1970), *cert. denied*, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66. Here, Judge Coffrin carefully considered the problem and warned the jury about the limited use to which the evidence could be put. We do not feel that there was an abuse of discretion in admitting the statements.

■ Harvey raises several further points which merit some brief discussion. On cross-examination by the government during the defense case, Mrs. Nutbrown testified about a prior burglary in New Hampshire for which Harvey had been convicted. Harvey claims that this testimony about similar past criminal conduct was highly prejudicial because it tended to show that he had a criminal character. We disagree.

Mrs. Nutbrown's testimony concerning the background of the prior New Hampshire burglary was elicited by the government on cross-examination after the defense had created, by her testimony, the impression that she had been involved in a deceitful scheme to have Harvey arrested unjustly. Her testimony on cross-examination described her cooperation with the police in Harvey's arrest for the earlier burglary in New Hampshire. We see no error in allowing the government to correct the false impression created by the defense questioning on direct examination. Because the testimony was introduced for a proper purpose, the fact that it also tended to show that the defendant had a criminal character does not render it inadmissible. In *United States v. Papadakis*, 510 F.2d 287, 294 (2 Cir., 1975), *cert. denied*, 421 U.S. 950, 95 S.Ct. 1682, this Court held that evidence of past criminal conduct is admissible if relevant for purposes other than solely to show the defendant's criminal character. See also *United States v. Torres*, 519 F.2d 723, 727 (2 Cir., 1975).

In any event, prior to her testimony, the defendant's earlier felony conviction for the burglary described by Mrs. Nutbrown had already been introduced into evidence by the government with respect to Count III of the indictment. The gravamen of the offense charged in that count was the interstate transportation of dynamite by a *convicted felon* in vio-

---

7. It does not appear from the record that the district court knew of the government's intention to introduce Nutbrown's statements prior to the beginning of the trial. Had there been a motion for severance of the counts and had the district court been aware of this evidentiary problem prior to trial, our conclusion with respect to this issue may well have been quite different. We expect, however, that such a motion would properly have been granted.

ation of 18 U.S.C. §§ 842(i)(1) and 844(a). Harvey's prior conviction was therefore an essential element of the crime charged in that count. Furthermore, Harvey's counsel had specifically mentioned this particular conviction to the jury during the jury selection process. Mrs. Nutbrown's testimony was thus simply a repetition of evidence of Harvey's past criminal conduct already before the jury.

Finally, Harvey claims that there was insufficient evidence to sustain a conviction with respect to the counts involving the interstate transportation of explosive materials. Once again, we must disagree. Although there was no direct evidence on the matter, the circumstantial evidence read in the light most favorable to the government is overwhelming.

George Kiblin testified that Harvey had stated several times that he would bring the necessary "firepower" with him on the night of the burglary. Kiblin further testified that the dynamite seized by the police at the lumberyard had come from the trunk of Harvey's car at about midnight. Furthermore, Mrs. Nutbrown testified that Harvey and his automobile were in Barre, Vermont earlier the same evening.

There was additional testimony from a Vermont police official that there had been numerous dynamite thefts from granite sheds in the Barre area.[8] Kiblin also testified that Harvey had stated that he had stolen the dynamite from a granite shed, but Kiblin could not remember whether or not Harvey had mentioned the location of the shed. Harvey now seizes upon Kiblin's inability to identify the ultimate source of the dynamite as somehow establishing that there was no proof of its interstate transportation. In fact, the ultimate source is irrelevant here where there is nothing in the entire record of the pro-

ceedings below to suggest that the dynamite came from anywhere but Vermont on the night of the attempted burglary.

Appellant's other claims are without merit and need not be discussed.

Judgment of conviction is affirmed.

---

**8.** We note that, because of Harvey's prior felony conviction, it would have been indeed difficult, if not impossible for him to obtain dynamite by legal means. 18 U.S.C. § 842(a)(1) and (d)(2).