954 F.2d 839
 34 Fed. R. Evid. Serv. 909
 UNITED STATES of America, Appellee,
v.
DiNOME, et al., Defendants,
Salvatore Mangialino, Anthony Senter, Joseph Testa, Ronald
Ustica, Carlo Profeta, a/k/a Carlos a/k/a
Carmello, Douglas Rega, Judith May
Hellman, Wayne Hellman, and
Sol Hellman,
Defendants-Appellants.
 Nos. 9, 7, 8, 11, 10, 15, 13, 12 and 14, Dockets 89-1458,
89-1459, 89-1527, 89-1537, 89-1550, 89-1556,
90-1229, 90-1230 and 90-1263.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 23, 1991.
Decided Jan. 22, 1992.
 
 Harriet B. Rosen, New York City, for defendant-appellant Salvatore Mangialino.
 Herald Price Fahringer, New York City (Diarmuid White, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, of counsel), for defendant-appellant Joseph Testa.
 Benjamin Brafman, New York City, for defendant-appellant Anthony Senter.
 Lee A. Ginsberg, New York City (Freeman, Nooter & Ginsberg, of counsel), for defendant-appellant Ronald Ustica.
 Daniel Nobel, New York City, for defendant-appellant Carlo Profeta.
 David L. Lewis, New York City (Lewis & Fiore, of counsel), for defendant-appellant Douglas Rega.
 David Cooper, New York City, for defendant-appellant Judith May Hellman.
 Lorin Duckman, New York City, for defendant-appellant Wayne Hellman.
 Jay Gregory Horlick, Brooklyn, N.Y., for defendant-appellant Sol Hellman.
 J. Gilmore Childers, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Miguel A. Estrada, James A. Goldston, Michele Hirshman, Cari Robinson, Cathy Seibel, Daniel C. Richman, Helen Gredd, Asst. U.S. Attys., of counsel), for appellee.
 Before WINTER and ALTIMARI, Circuit Judges, and POLLACK, District Judge.*
 WINTER, Circuit Judge:
 
 
 1
 This is an appeal arising out of a sixteen-month jury trial involving a host of racketeering and other criminal charges, detailed in the margin,[1] based on the activities of the so-called DeMeo Crew, a component of the Gambino organized crime family. Over 1000 pages of briefs have been filed raising dozens of common and individual claims of error. Except for those raised by Wayne and Judith Hellman, every such claim is meritless. Indeed, all but a few are so meritless that we dispose of the great bulk of them in a summary order, filed simultaneously with this opinion, pursuant to our Local Rule § 0.23. This published opinion is limited to a discussion of certain claims common to all appellants, the reasons for a reversal as to two appellants, and certain arguments raised with regard to convictions for a civil rights murder.
 
 
 2
 Appellants Testa, Senter, Mangialino, Profeta, Ustica, Rega, and the now-deceased Sol Hellman[2] were either members of, or persons demonstrated to have ongoing relations with, the DeMeo Crew. Appellants Wayne and Judith May Hellman were the son and daughter-in-law of Sol Hellman. The DeMeo Crew engaged in a vast array of illegal activities, including kidnapping, loansharking, narcotics distribution, pornography, extortion, firearms conspiracy, and the operation of an international stolen car ring. From the early 1970's to the 1980's, these activities were furthered by calculated violence, including the brutal murders of various persons viewed by the Crew as a threat to their business. Eventually, the Crew's leader, Roy DeMeo, was himself murdered.
 
 
 3
 A seventy-eight count indictment charged twenty-four persons with various crimes in connection with the activities of the DeMeo Crew. A number of the charges in the original indictment were severed, and an initial trial was held on non-RICO auto theft and exportation charges. A second trial addressed the RICO and remaining substantive charges. This appeal arises from the convictions in the second trial.
 
 A. Length and Complexity of Trial
 
 4
 Appellants argue that the length of the trial, the complexity of the factual and legal issues, and the sheer numbers of defendants, witnesses, and crimes charged, denied them a fair trial. In this regard, they rely principally on United States v. Casamento, 887 F.2d 1141 (2d Cir.1989), cert. denied, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990), in which we expressed "misgivings about trials of [a similar] magnitude." See id. at 1151. However, we also "recognize[d] that district judges must retain a considerable degree of discretion in determining whether, on balance, the fair administration of justice will be better served by one aggregate trial of all indicted defendants or by two or more trials of groups of defendants." Id.; United States v. Chang An-Lo, 851 F.2d 547, 566 (2d Cir.), cert. denied, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). A district court's denial of a motion to sever will, therefore, be reversed only upon a showing that the district court clearly abused its discretion. Id.; Casamento, 887 F.2d at 1149.
 
 
 5
 There is no support in caselaw or in logic for the proposition that a lengthy trial, a large number and variety of charges, and numerous defendants violate due process without a showing that the issues were actually beyond the jury's competence. No such showing was made in the instant matter. The crimes here may have been large in number and variety, but they were rather ordinary in nature, except in their viciousness. The evidence could also be understood without difficulty, the alleged complexity stemming more from the abundance of evidence than from the subtlety of the analysis needed to consider it.
 
 
 6
 The claim that the jury must have lacked the capacity to understand the instructions given it is thus sheer speculation. As we stated in Casamento,Although the jury had to evaluate a tremendous amount of evidence, the nature of the evidence and the legal concepts involved in the case were not extraordinarily difficult to comprehend, as they might be, for example, in a complex antitrust case involving abstruse economic theories or an employment discrimination case involving technical statistical evidence and formulae.
 
 
 7
 887 F.2d at 1150. The voluminous body of evidence, the careful instructions of the trial judge regarding the right of each defendant to individualized consideration, the opportunity afforded the jurors to take notes throughout the trial, the outline of the elements of the offenses provided by the judge to the jurors, the numerous requests for readbacks, the length of the deliberations, and the absence of any concrete evidence of unusual juror confusion, reinforce our conclusion that the jury comprehended the case.
 
 B. "Spillover" Prejudice
 
 8
 Many appellants claim error in so-called "spillover" prejudice resulting from the admission of evidence of violent activities engaged in by other members and associates of the DeMeo Crew. Separate trials, they assert, would have avoided this prejudice.
 
 
 9
 The particular claims of each defendant regarding spillover prejudice are addressed in the summary order. However, we note here that the government must prove an enterprise and a pattern of racketeering activity as elements of a RICO violation. 18 U.S.C. § 1962(c). Proof of these elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts. Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant, and the claim that separate trials would eliminate the so-called spillover prejudice is at least overstated if not entirely meritless.
 
 
 10
 In the present case, the evidence of numerous crimes, including the routine resort to vicious and deadly force to eliminate human obstacles, was relevant to the charges against each defendant because it tended to prove the existence and nature of the RICO enterprise, the DeMeo Crew. Such evidence was also relevant to prove a pattern of racketeering activity by each defendant. See United States v. Friedman, 854 F.2d 535, 563 (2d Cir.1988), cert. denied, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). As we stated in United States v. Indelicato,
 
 
 11
 In some cases both the relatedness and the continuity necessary to show a RICO pattern may be proven through the nature of the RICO enterprise. For example, two racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise. The nature of the enterprise may also serve to show the threat of continuing activity. Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity.... We do not suggest ... that the defendant is to be held accountable for the racketeering acts of others. We simply note that such an association may reveal the threat of continued racketeering activity and thereby help to establish that the defendant's own acts constitute a pattern within the meaning of RICO.
 
 
 12
 865 F.2d 1370, 1383-84 (2d Cir.1989) (en banc). The evidence of the DeMeo Crew's various criminal activities was, therefore, relevant to the RICO charges against each appellant--save Wayne and Judith Hellman, for reasons discussed infra--because it tended to prove: (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities.
 
 
 13
 Appellants' "spillover" claim is thus misnamed. The typical spillover claim is that evidence admissible against only one defendant is prejudicial to all defendants and that individual trials should have been held to avoid that prejudice. See, e.g., United States v. Cervone, 907 F.2d 322, 341-42 (2d Cir.1990), cert. denied, --- U.S. ---, 111 S.Ct. 680, 112 L.Ed.2d 672 (1991). In the present case, however, the evidence in question is relevant to the RICO charges against all defendants and most probably would have been admitted even if defendants had been accorded individual trials. See United States v. Villegas, 899 F.2d 1324, 1347 (2d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990); Casamento, 887 F.2d at 1153.
 
 
 14
 Presumably, a RICO defendant could stipulate that the charged RICO enterprise existed and that the predicate acts, if proven, constituted the requisite pattern of racketeering activity. The evidence of crimes by others might then be excluded, and the defense would stand or fall on the proof concerning the predicate acts charged against the particular defendant. No such stipulation was entered into in the instant matter, however.
 
 
 15
 The only limit on the admission of evidence as to the crimes in question, therefore, lies in the claims by particular defendants that the probative value of such evidence as to them was outweighed by its prejudicial impact under Fed.R.Evid. 403. Such claims must surmount considerable obstacles on an appeal, however, because the evidence in question is directly relevant to two elements of a RICO violation and its admission is a largely discretionary matter on the part of the district court. In the instant case, the particular Rule 403 claims barely confront, much less surmount, these obstacles, and our discussion of them is contained in the summary order.
 
 
 16
 C. The Hellmans' Mail and Wire Fraud Convictions
 
 
 17
 However, there are two appellants against whom none of the evidence relating to the alleged RICO enterprise was admissible, and we reverse their convictions. Wayne and Judith May Hellman ("the Hellmans") were tried along with the other appellants on both the RICO bribery charges and the mail and wire fraud charges. The government sought to link the Hellmans to the DeMeo Crew by theorizing that Judith had been bribed for her efforts as a juror to secure an acquittal in a state court murder trial of one Anthony Gaggi. The bribe was claimed to have been arranged by Sol Hellman and the DeMeo Crew. The government further contended that the Hellmans used the proceeds of the bribe to purchase a new home. The mail and wire fraud charges grew out of their efforts to obtain loans for that home and for a new car. Near the close of the trial, the Hellmans moved pursuant to Fed.R.Crim.P. 29 for a judgment of acquittal on the RICO and bribery charges and, claiming spillover prejudice, requested a mistrial as to the remaining charges. The Rule 29 motion was granted as to the RICO and bribery charges, but the request for a mistrial was denied. The Hellmans were then convicted of mail and wire fraud. (Wayne Hellman was convicted of extortion, but the district court set this conviction aside.) We believe that a mistrial should have been granted.
 
 
 18
 A dismissal of charges pursuant to Fed.R.Crim.P. 29 does not require granting a mistrial as to remaining charges unless the dismissed charges were brought in bad faith or the defendants suffered some prejudice as a result of the presence of the now dismissed charges. Friedman, 854 F.2d at 581; United States v. Ivic, 700 F.2d 51, 65 (2d Cir.1983); United States v. Losada, 674 F.2d 167, 170 (2d Cir.), cert. denied, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982).
 
 
 19
 We cannot escape the conclusion that the evidence against the Hellmans' codefendants--including vicious murders, loansharking, auto theft, pornography, and firearms trafficking and the very nature of the DeMeo Crew--was prejudicial to the Hellmans. See United States v. Branker, 395 F.2d 881, 887-89 (2d Cir.1968), cert. denied, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969) (finding prejudice against some defendants in lengthy trial involving numerous counts unrelated to those defendants). Once the RICO charges against the Hellmans were dismissed, all but an infinitesimal fraction of the evidence at this sixteen-month trial lost any relevance to the mail and wire fraud charges against them. Instead of being swamped by this mass of irrelevant evidence, these charges should have been tried separately.
 
 
 20
 The government argues that the Hellmans effectively waived their right to a mistrial when they refused the court's earlier offer of a severance. However, as explained supra, the RICO-enterprise-related evidence would have been admissible, subject to Rule 403 analysis, against the Hellmans in a severed trial. Once the RICO charges against them were dismissed, the Hellmans stood in a very different posture with respect to the evidence relevant to the RICO charges. That evidence was then irrelevant yet highly prejudicial in the context of the remaining mail and wire fraud charges.
 
 
 21
 A "trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear.... [W]here, as here, the charge which originally justified joinder turns out to lack the support of sufficient evidence, a trial judge should be particularly sensitive to the possibility of such prejudice." Schaffer v. United States, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). After the granting of their Rule 29 motion on the RICO counts, the Hellmans should have been severed for a separate trial on the mail and wire fraud counts. Such a trial could have been completed in a very short period of time, with the risk of spillover prejudice entirely eliminated. The Hellmans' mail and wire fraud convictions must thus be reversed. They may of course be retried.
 
 D. The Civil Rights Murders
 
 22
 One of the activities of the DeMeo Crew involved exporting late-model, stolen American cars to Kuwait. Ronald Falcaro and Khaled Daoud conducted a competing, but legitimate, venture of exporting cars to Kuwait. Noting the easy availability of vehicles to their competitor, Ronald Ustica, Daoud came to suspect that the DeMeo operation involved stolen cars and began copying down Vehicle Identification Numbers from cars in the DeMeo inventory. This was a fatal mistake because he was observed doing so by Ronald Ustica, the leader of the DeMeo stolen car scheme. Falcaro and Daoud were thereafter lured to a garage in Brooklyn by a false promise that Fred DiNome would sell them a portion of his excess inventory. Once inside the garage, Falcaro and Daoud were murdered by a group of men that included Joseph Testa and Anthony Senter.
 
 
 23
 Testa and Senter were convicted under 18 U.S.C. § 241 (1988) for Falcaro's murder as a violation of his civil right to be a witness in a federal proceeding. Testa and Senter argue on appeal that an element of proof of this offense was lacking, namely the requirement that Testa and Senter acted with the intent to interfere with Falcaro's right to be specifically a federal witness. Testa and Senter misconceive the nature of the proof required to establish a violation of 18 U.S.C. § 241.
 
 
 24
 Section 241 protects, inter alia, the right to provide information about federal crimes to authorities, United States v. Harvey, 526 F.2d 529, 535 (2d Cir.1975), cert. denied, 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976), and the right to be a witness in a federal proceeding, United States v. Pacelli, 491 F.2d 1108, 1113 (2d Cir.), cert. denied, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974). Whether Testa and Senter violated Falcaro's rights under Section 241 depends upon whether: (i) Falcaro possessed those civil rights and (ii) Testa and Senter intended to interfere with the exercise of those rights. It is not necessary, however, to show knowledge on their part that Falcaro possessed those specific civil rights or that Falcaro was actually likely to become specifically a federal witness. Cf. United States v. Yermian, 468 U.S. 63, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984) (in prosecution for making false statements in matter within the jurisdiction of federal agency no need to prove knowledge of federal agency jurisdiction); United States v. McClean, 528 F.2d 1250, 1255 (2d Cir.1976) (in prosecution for depriving individual of constitutional rights government does not have to prove specific intent to deprive person of federal right, because "consequences of appellants' conduct must be deemed to have been intended"). Rather, it need only be shown that Testa and Senter: (i) knew of facts that constituted a federal crime in which they were implicated whether or not they knew of its federal implications; (ii) knew that Falcaro possessed evidence regarding their criminality; and (iii) took action specifically to interfere with his providing that information to authorities or testifying as to that evidence anytime or anywhere whether or not there was imminent contact between Falcaro and federal authorities.
 
 
 25
 Falcaro clearly possessed the requisite right at the pertinent time. He knew of the scheme to export stolen automobiles to Kuwait, facts that constitute a federal crime. See 18 U.S.C. § 2312. The right to be a witness in a federal proceeding attaches at the time such a person is possessed of evidence sufficient to create the potential of becoming a federal witness. See Harvey, 526 F.2d at 535 n. 6 (victim who possessed knowledge of the interstate source of explosive used to commit crime "was a potential federal witness and accordingly did have the objective right contemplated by the statute"). Testa and Senter knew of the facts constituting the federal crime and of Falcaro's sharing of that knowledge. Their murder of Falcaro was self-evidently intended to prevent him from disseminating his knowledge of those facts, including the provision of information to federal authorities or testimony as a witness in federal criminal proceedings. That Falcaro was at that time not in contact with federal officials neither diminishes his ongoing civil right to testify in a federal proceeding nor excuses Testa's and Senter's intent to prevent testimony anytime and anywhere. The evidence was thus sufficient to prove a violation of Section 241.
 
 
 26
 Ustica, who, as noted, headed up the scheme to export stolen cars to Kuwait, argues that hearsay statements by Daoud and Falcaro were improperly admitted. The hearsay testimony was offered by Youssef Najjar, Khaled Daoud's brother, and by Daniel Roland, Falcaro's business associate. Najjar's testimony included statements by Daoud to the effect that he was going to see an attorney about some car thieves. Roland reported that Falcaro had expressed incredulity at the fact that his competitor, Ustica, seemed to obtain cars without apparent effort. These declarations, although hearsay, were clearly admissible under Fed.R.Evid. 803(3), which excepts from the prohibition of hearsay any "statement[s] of the declarant's then existing state of mind." The statements in question established the victims' existing and ongoing suspicions concerning Ustica's exportation business and were relevant to show Ustica's motive to kill them. As such, they fell squarely within the exception. See United States v. Donley, 878 F.2d 735, 737-38 (3d Cir.1989) (hearsay statements by a murder victim are admissible to show motive), cert. denied, 494 U.S. 1058, 110 S.Ct. 1528, 108 L.Ed.2d 767 (1990).
 
 
 27
 Ustica's related contention that the hearsay statements should have been excluded because they lacked the requisite additional indicia of reliability is misplaced. "[I]f a[n out-of-court] declaration comes within a category defined as an exception, the declaration is admissible without any preliminary finding of probable credibility by the judge...." United States v. DiMaria, 727 F.2d 265, 272 (2d Cir.1984); United States v. Lawal, 736 F.2d 5, 8 (2d Cir.1984) ("DiMaria held that relevant declarations which fall within the parameters of Rule 803(3) are categorically admissible....") (emphasis in original). Because the out-of-court statements of Falcaro and Daoud were admissible under Fed.R.Evid. 803(3), further indicia of their reliability was unnecessary.
 
 CONCLUSION
 
 28
 The convictions of Wayne and Judith Hellman are reversed; the convictions of the other appellants, save those of Sol Hellman, see Note 2, supra, are affirmed.
 
 
 
 *
 The Hon. Milton Pollack, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 Appellants, with the exception of Wayne and Judith May Hellman, were convicted of engaging in a racketeering enterprise in violation of 18 U.S.C. § 1962(c) (1988) and conspiring to engage in such an enterprise in violation of 18 U.S.C. § 1962(d) (1988). Additionally, various appellants were convicted of the murder of a federal witness in violation of 18 U.S.C. § 241 (1988), conspiracy to make extortionate extensions of credit in violation of 18 U.S.C. § 892 (1988), conspiracy to collect extensions of credit by extortionate means in violation of 18 U.S.C. § 894 (1988), mail and wire fraud in violation of 18 U.S.C. § 1341, 1343 (1988), extortion in violation of 18 U.S.C. § 1951 (1988), conspiracy to commit firearms violations in violation of 18 U.S.C. § 371 (1988), conspiracy to possess and distribute marijuana and cocaine in violation of 21 U.S.C. § 846 (1988), and possession and distribution of narcotics in violation of 21 U.S.C. § 841 (1988)
 
 
 [2]
 Sol Hellman died while this appeal was pending. His convictions have been vacated