Douglas REGA, Petitioner–Appellee,

v.

**UNITED STATES of America, Respondent–Appellant.**

**Docket No. 00–2287.**

United States Court of Appeals, Second Circuit.

Argued May 11, 2001.

Decided Aug. 27, 2001.

Daniel S. Ruzumna, Assistant United States Attorney (Mary Jo White, United States Attorney, and James J. Benjamin, Jr. and Gary Stein, Assistant United States Attorneys, of counsel), New York, NY, for Respondent–Appellant.

David L. Lewis, New York, NY, for Petitioner–Appellee.

Before OAKES, WINTER, and STRAUB, Circuit Judges.

WINTER, Circuit Judge:

The government appeals from Judge Stanton's order vacating the convictions and sentence of petitioner Douglas Rega, pursuant to 28 U.S.C. § 2255. *See Rega v. United States,* No. 96 Civ. 2728, 2000 WL 356403 (S.D.N.Y. Apr.6, 2000) (*"Rega II"*). The district court concluded that Rega did not receive the constitutionally required effective assistance of counsel because his attorney prevented him from testifying on his own behalf. *See Rega v. United States,* No. 84 CR. 63, 1999 WL 20889, at *4–6 (S.D.N.Y. Jan.19, 1999) (*"Rega I "*). The district court further concluded that there was a reasonable probability that the failure to testify adversely affected the outcome of Rega's trial. *See Rega II,* 2000 WL 356403, at *3.

We hold that there is no reasonable probability that Rega's testimony would have altered the outcome of his trial. Accordingly, we reverse.

## BACKGROUND

Rega and twenty-three co-defendants were charged with violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d), and various other federal laws through their involvement in the activities of a racketeering enterprise known as the DeMeo Crew, a component of the Gambino organized crime family. Rega was also charged with various substantive offenses that need not be detailed.

Rega's alleged role in the enterprise was to supply the DeMeo Crew with pornographic films, which the Crew then sold for a large profit. The government further alleged that Rega paid the DeMeo Crew to kill his uncle, Fred Todaro, who also was in the pornography business, because of a dispute over the building in

which they duplicated films. According to the government, Rega had Todaro killed to gain control of the building, which could at the time be profitably converted into apartments.

After a sixteen-month trial before Judge Broderick,[1] Rega was convicted on all counts. In October 1989, Judge Broderick sentenced Rega to forty years' imprisonment. On direct appeal, we affirmed Rega's conviction. *See United States v. DiNome,* 954 F.2d 839 (2d Cir.1992); *United States v. DiNome,* 954 F.2d 839 (2d Cir.1992) (unpublished summary order) (rejecting Rega's claims that evidence was improperly admitted and legally insufficient, counsel was ineffective, and government's remarks during summation were prejudicial).

In 1996, Rega filed the present petition alleging, *inter alia,* that his counsel refused to let him testify and therefore provided constitutionally ineffective assistance of counsel in violation of the Sixth Amendment.[2] Relying primarily on affidavits submitted by Rega's trial counsel, Judge Stanton concluded that Rega was not adequately informed of his right to testify.[3] *See Rega I,* 1999 WL 20889, at *5–6. Initially, the district court also held that Rega had not shown that he had been prejudiced by this omission because, by his own description, his testimony would either have duplicated evidence admitted at trial or was otherwise insufficient to affect the outcome of the trial. *See id.* at *6–11. How-

ever, the court denied the petition without prejudice, allowing Rega to submit additional papers with regard to the probability that his testimony would have altered the result. *See id.* at *11. Rega thereafter amplified his proposed testimony. Based on the new submission, the district court decided that Rega had shown a reasonable probability that, had he testified, he would have been acquitted. *See Rega II,* 2000 WL 356403, at *1.

The district court found that Rega's testimony would have undermined the government's case in five specific ways that we discuss in detail *infra,* and that "[o]ne cannot assess with certainty the degree to which cross-examination would have impeached Rega's defense." *Id.* at *2. The court acknowledged that defense counsel believed that it was highly inadvisable for Rega to testify because his testimony would open the door for the government to introduce Rega's previous conviction for pornography and audiotapes of conversations between Rega and his mother in which Rega repeatedly expressed his hostility to Todaro along with threats to harm him. The district court found that the pornography conviction would not have been "mortal to Rega's defense," *id.,* because Rega explained that he was convicted only because he was the film laboratory manager and that he had no knowledge of the nature of the films duplicated. As to the tapes, the district court concluded that "[t]he jury may see them as merely an

---

1. Because Rega brought his Section 2255 petition after Judge Broderick's death, the petition was assigned to Judge Stanton.

2. Rega also claimed that the government failed to disclose favorable defense evidence, as required under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court rejected that claim, and Rega has abandoned it on appeal.

3. The affidavits stated that Rega and his counsel had frequently discussed whether it would

be prudent for Rega to testify and that counsel had concluded that it was not in Rega's best interest to do so. However, counsel could not recall whether the ultimate decision was Rega's or counsel's own. Because we do not reach the question of whether Rega's counsel provided ineffective assistance, *see infra,* we need not discuss whether the conclusions drawn therefrom by the district court were correct.

extravagant, private blowing-off of steam." *Id.* The court therefore granted the petition. *See id.* at *3.

This appeal followed. We granted a stay of the district court's order pending appeal.

## DISCUSSION

■■■ A defendant in a criminal case has the constitutional right to testify on his own behalf, *see Rock v. Arkansas,* 483 U.S. 44, 49–51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), and we have held that a "trial counsel's duty of effective assistance includes the responsibility to advise the defendant concerning the exercise of this constitutional right," *Brown v. Artuz,* 124 F.3d 73, 74 (2d Cir.1997). To bring a claim of ineffectiveness of counsel under the Sixth Amendment, however, a defendant must show not only counsel's deficient performance, but also a reasonable probability that the deficiency prejudiced the outcome. *See Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.")

■■■ We review the district court's findings of fact for clear error, *see Flores v. Demskie,* 215 F.3d 293, 300 (2d Cir.), *cert. denied,* 531 U.S. 1029, 121 S.Ct. 606, 148 L.Ed.2d 517 (2000); *Zovluck v. United States,* 448 F.2d 339, 341 (2d Cir.1971), and its decision to grant the petition *de novo, see Mask v. McGinnis,* 233 F.3d 132, 139 (2d Cir.2000), *petition for cert. filed,* 69 U.S.L.W. 3657 (U.S. Mar. 26, 2001) (No. 00–1518). We conclude that it was clear error for the district court to find a reasonable probability that Rega's proposed

testimony would have altered the outcome of the trial.

Our analysis will begin with a description of the government's case against Rega. We will then outline Rega's proposed testimony and its effect in opening the door to further prosecution evidence. Finally, we will discuss the five specific areas of Rega's proposed testimony relied upon by the district court in concluding that there was a reasonable probability that such testimony would have led to an acquittal.

At trial, the government produced ample evidence of Rega's involvement in duplicating pornographic films, storing them in his mother's house, and then distributing them to the DeMeo Crew. Todaro operated a film laboratory out of a building that he originally owned. Rega had worked for, or with, Todaro for many years, and Todaro was also involved in pornographic film trafficking. The evidence was somewhat unclear as to whether Rega's similar activities were in conjunction with Todaro, an independent venture, or a combination thereof.

The government offered extensive evidence of a dispute between Rega and Todaro over control of the building. There was testimony that Todaro had transferred title to the business and the building to Rega, or to some entity or person under Rega's control, in order to hide assets temporarily during Todaro's divorce proceedings. After Todaro's divorce, however, Rega refused to return the building and business to Todaro because Rega had come upon a profitable opportunity to convert the building into apartments. Todaro brought a lawsuit contesting rights of possession (claiming to be a tenant) of the building and of the film equipment in it. The lawsuit, which ended after Todaro disappeared as a result of his murder, was

portrayed by the government as threatening Rega's plans.

There was much evidence that Rega's dispute with Todaro was not limited to the mounting of legal claims and defenses. At one point, Rega, who was shown to have been involved in violent acts and to have carried firearms, told Todaro's son that if his father continued to seek control of the building, the father would get hurt. Witnesses also testified that Rega sought out Todaro at Rega's aunt's house and beat Todaro while attempting to kidnap him. There was further evidence, including post-arrest statements by Rega himself, that Rega paid the DeMeo Crew $10,000 to murder Todaro.

Rega's submissions in response to the court's invitation to provide more detail cover some 159 pages. In his proposed testimony, he denied any involvement in the pornographic film business, while conceding that Todaro might have been so involved without Rega's knowledge.

He described his relationship with Todaro as friendly, albeit at times difficult because of Todaro's serious personal and financial difficulties, as to which Rega offered advice and aid. He also described his differences with his uncle solely as the result of Todaro's lack of management skills and growing irrationality. Rega stated that the notion that the lawsuit was regarded by him as threatening was "ludicrous." In fact, Rega "saw [the lawsuit] as an opportunity to clear up this chapter of the family disputes." He denied beating and trying to kidnap Todaro. As he explained, the public altercation with Todaro occurred when he went to his Aunt Josephine's house to inquire about a Halloween egg-throwing prank and was irrationally and unexpectedly pushed by Todaro. Rega's only act was described as a defensive push back. He flatly denied ever threatening or harming Todaro, or

hiring someone to do so. He disputed the account of his post-arrest admissions. Finally, he portrayed himself as a family man who "live[d] ... by the Ten Commandments."

This much is clear about Rega's proposed testimony: It provided no evidence of significance that is not wholly dependent on either his credibility or on the incredibility of the witnesses against him. We know from the verdict that the jury found the evidence against Rega credible, although testimony by Rega would obviously have been added to the credibility mix weighed by the jury had he taken the stand. Any probability of an acquittal, therefore, must be based on an assessment that, if Rega had testified, the jury would have credited his testimony, notwithstanding the substantial evidence against him.

Our review suggests that defense counsel was right. If Rega had taken the stand, the probability of a conviction would have increased because his testimony would have been severely undermined by impeachment evidence. Rega's proposed testimony pointedly denied any involvement in pornography, although conceding that Todaro might have been so involved without Rega's knowledge. However, witnesses provided evidence of Rega's involvement in pornographic films at the duplication site in the disputed building, the storage site in his mother's home, and in delivering the product to the DeMeo Crew.

Worse, Rega's denial of such involvement would have opened the door to introduction of the state court conviction involving pornographic films. To be sure, much of the potential sting of that conviction would be lessened by the fact that the jury already knew of the arrest underlying it. However, some sting would still be felt, and Rega would either have to remain silent or provide some explanation for his conviction. The explanation provided in

his proposed testimony was that his co-defendant in the case had been allowed to use equipment in the laboratory without supervision and that only he knew that pornographic films were being duplicated. Rega, the laboratory manager, was ignorant of that fact according to the proposed testimony.

We cannot say that the district court was wrong in opining that a "jury might or might not accept that explanation," *Rega II*, 2000 WL 356403, at *2, but we believe that, on this record, a jury's crediting it would be highly unlikely. It would have required the jury to disbelieve the testimony of other witnesses regarding Rega's involvement in the duplication, storage, and distribution of pornography on the basis of his general denial. Much like the proverbial piano player in the brothel who had no idea what was going on upstairs, that denial would be offered in a context of professions of ignorance, not only of the activities of his state court co-defendant, but also of those of his uncle. A jury had already found that Rega was knowingly involved in the co-defendant's trafficking in pornographic films, and we believe that a jury in the present matter would not, on this record, credit two claims of ignorance, particularly since Rega had been deeply involved in his uncle's business for years. Therefore, while the state court conviction might not have added much to the government's case, Rega's proposed explanation would nonetheless have severely undermined his credibility.

The pornography conviction, however, was not the only damaging evidence that would have impeached Rega's credibility. Audiotapes of conversations between Rega and his mother had been excluded from evidence by the trial court with the reservation that they would be admitted if Rega "opened the door." Conceding that the tapes would have come in if Rega had

testified, the district court found that they would not necessarily have been damaging because "[t]he jury may see them as merely an extravagant, private blowing-off of steam." *Rega II*, 2000 WL 356403, at *2.

We believe that conclusion is clear error because it fails to take into account the evidentiary context in which the tapes would have been introduced. Before their admission, the jury would have heard evidence from several different witnesses as to Rega's involvement in violence and the possession of firearms, the litigation between Todaro and Rega, threats by Rega to Todaro, Rega's physical assaulting and attempted kidnapping of Todaro, Rega's payment of $10,000 to the DeMeo Crew to murder Todaro, Todaro's resultant murder, and a post-arrest admission of the $10,000 payment by Rega. We know from the outcome of the trial that the jury credited this evidence. Had Rega testified, he would have described a friendly relationship with Todaro, given his view of the litigation between them as "an opportunity," denied the threats, offered a favorable version of the physical altercation between them, and denied any involvement in Todaro's murder.

Faced with a head-on conflict between the government's witnesses and Rega's testimony, the jury would then have heard the audiotapes, conceded to be between Rega and his mother, of tirades by Rega concerning both Todaro—his mother's brother—and Rega's own brother. In these extensive tirades, Rega, *inter alia*, laments that he has been "working very hard to create a situation for my family . . . for the scumbag [Todaro] . . . who turned around and stabbed me in the back." Rega suggests that Todaro and Rega's brother "could share the same box" and that he, Rega, will "break both their heads with a baseball bat." After noting that "it's getting to the point that I can't restrain my-

self," Rega goes on to state that he will "straighten them both out. They could, they could stay ... in the same hospital room, as far as I'm concerned. I had enough of this shit." He notes at one point that "this afternoon, it almost came to a head. And I don't want to hurt anybody. But I don't want to be put into a position where, you know, that's all. It's as simple as that." He summed up his attitude toward Todaro as follows: "10 years, 15 years I've worked for Freddie, I wind up getting fucked now when I'm going to jail for 'cause of him and he's still looking to steal from me, no matter what happens, he's still trying to steal from me."

Given the credible evidence from several different witnesses as to Rega's threatening and assaulting of Todaro, and his paying to have him murdered, any mitigating effect of Rega's proposed testimony—amounting to pious denials—would have been more than offset by the audiotapes, which, even when viewed in a light most favorable to Rega, display a tone and attitude toward Todaro at diametric odds with his proposed testimony. Had Rega testified, therefore, he would have been in a far worse position than before he took the stand. His uncorroborated denials as to a hostile, violent attitude toward Todaro would have been so thoroughly shredded by his own taped words as to be further evidence of his guilt.

We therefore conclude that, had Rega testified at trial, the admission of the state court pornography conviction and audiotapes would have had a severely negative effect on his defense. However, the district court also found that some portions of Rega's proposed testimony would be reasonably likely to lead a jury to acquit. In that regard, it noted five points that would have been made by Rega. We discuss those seriatim.

First, Rega

would contradict the government witness Harold Allen who testified that Rega wanted to open up his own laboratory to make adult films. Rega would testify, with concrete detail, that he was designing equipment for a new facility, to be owned by the Todaro family, under Fred Todaro's management.

*Rega II*, 2000 WL 356403, at *1. This proposed testimony does not seem to us to offer much, if any, weight regarding Rega's innocence. At best, it seems only to suggest that Rega had a friendly attitude toward Todaro and would be entirely contradicted by the audiotapes.

Second, Rega

would contradict Allen's description of Rega's "assault" on Fred Todaro shortly before Fred Todaro's murder, testifying that he merely went to speak to his Aunt Josephine after hearing that someone had thrown eggs on her car the Halloween night before, was pushed unexpectedly by Fred Todaro (who was speaking incoherently and acting strangely) and after pushing back, asking to speak to his Aunt Josephine and being pushed again, he returned to his car and left.

*Id.* The circumstances surrounding the altercation between Rega and Todaro is of great importance because it was used by the government to show Rega's hostile attitude and willingness to use violence toward Todaro, factors tending strongly to support the claim that Rega had Todaro murdered. We do not agree with the district court that Rega's proposed testimony—depicting Todaro as the aggressor and a single defensive push on Rega's part—would have been helpful. Allen did not provide the sole evidence as to the events. Contemporaneous statements by the aunt and Todaro himself indicated that Rega had come to her house and, with another man, beat Todaro and attempted to kidnap

him. A third witness saw the injuries to Todaro, which were not consistent with Rega's version, and the government introduced a contemporaneous photograph showing serious injuries. Again, we believe that Rega's proposed testimony would lead a jury to conclude that his unsupported contradictions of the ample evidence against him were lies and probative of guilt rather than innocence.

Third, the district court found that Rega's proposed testimony would cause a jury to lean toward acquittal because he

would contradict the prosecution's assertion that Fred Todaro was killed because only he could furnish information for a bill of particulars in his lawsuit against Rega. Rega would testify that Barbara Todaro could readily have done so. That is significant, because the government argued that Rega's demand for the bill of particulars after Fred Todaro's disappearance indicated that Rega had plotted Todaro's murder in order to hobble the lawsuit.

*Id.* This proposed testimony would be admissible at best only as evidence of Rega's belief as to Barbara Todaro's ability to furnish the pertinent information and not as to her actually being able to do so. As such, it would, without corroboration, suffer from being highly self-serving and only marginally relevant. Moreover, Barbara Todaro's testimony at the trial did not show that she would have been helpful in furnishing such information, and Fred Todaro's lawyer testified that his disappearance hampered prosecution of the lawsuit. We therefore see little potential benefit to Rega in this aspect of his proposed testimony.

Fourth, the district court found it significant that Rega

would contradict Postal Inspector Lauziere's testimony that Rega delivered $10,000 to Roy DeMeo. At trial, the government suggested that Rega gave DeMeo this money for the murder of Todaro. Rega would testify that on one occasion he delivered to DeMeo an envelope which contained papers and money to register DeMeo's new 1976 El Dorado; that the envelope contained only enough money to register the car; that the delivery was in 1976 (Todaro was killed in 1979); and that the envelope was delivered to DeMeo at Fred Todaro's request.

*Id.* Again, we see no likely change in the jury's view of events to have resulted from hearing this portion of Rega's proposed testimony. In it, he concedes telling the postal inspector that he paid money to DeMeo but disputes what he said about the amount and the timing. Given other evidence that Rega paid $10,000 to DeMeo to have Todaro murdered, we believe that a jury would again view Rega's testimony as self-serving, uncorroborated, and false.

Finally, Rega

would correct and explain Lauziere's testimony quoting him as stating "I did not kill my Uncle Fred over the building," which the government had argued showed consciousness of guilt. On the contrary, Rega would testify, his statement was made in response to Lauziere's accusatory questions regarding Fred Todaro and the 415 West 55 Street building, which provoked Rega into stating affirmatively that he did not kill his Uncle Fred Todaro. There is force to Rega's argument that leaving Lauziere's inference unanswered allowed the jury to accept Lauziere's implication.

*Id.* At best, this proposed testimony would answer the inference Lauziere drew from Rega's post-arrest statement. It does not even purport to contradict the ample evidence of his guilt.

We therefore conclude that Rega's proposed testimony would have added little weight to his defense but would have opened the door to introduction of the pornography conviction, followed by a less than credible explanation, and of the highly damaging audiotapes showing an extremely hostile and violent attitude toward his uncle. In our view, his testimony would have done more harm than good. We therefore reverse.